May it please the Court, Counsel. I think we are at the start of a three-course meal coming up now, potatoes, beef, and fish. My name is Michael Gilmore. I'm a Deputy Attorney General for the State of Idaho, and I represent the Idaho Potato Commission. We're here to talk about certification marks. Congress created certification marks for the benefit of the little guys, the ultimate consumers, for example, who want to go into a store and buy a toaster or a lamp and make sure that the lamp or the toaster is safe, and I won't electrocute their kids when I plug it in. Certification mark owners do not and cannot profit from the goods sold with their marks. They're often nonprofit corporations or government agencies with limited resources to release their marks. The issue before this Court is whether the Lanham Act gives former licensees a right to challenge a mark after they have contracted not to challenge the mark and after they were caught unlawfully using the mark. The Second Circuit says that's okay. We're asking the Ninth Circuit to say it is not. Nothing in the Lanham Act suggests that enforcement of these kind of contracts, the no-challenge provision of a contract, stands as an obstacle to enforcement of the Lanham Act or frustrates the Lanham Act. The Lanham Act's purposes and objectives are to avoid misleading and deceptive labeling. There is no public interest in encouraging a challenge that would lead, for example, to passing certification marks into the public domain, because once a certification mark passes into the public domain, you've lost the most valuable aspect of the mark, an independent certifying body that will tell the public these goods are what they stand for. These goods are safe if you see the UL on them. These goods are produced by people who are paid a fair wage if you see that kind of certification. These goods are grown and marketed from the geographic region from which they come. The Second Circuit said that the Lanham Act shouldn't be controlling its purposes. They turn to the principles of the patent law to find that there is a reason why. The holder of a certification mark, must the holder issue the mark when the applicant meets the qualifications? The holder must allow any applicant who meets its standards and qualifications to use the mark. And let's take Underwriters of Libraries, for example. It's not merely that you meet their safety standards. It's that you allow inspectors to come into your manufacturing plant and that you maintain records. And the Idle Potato Commerce has similar standards. It's not merely that you're dealing with idle potatoes. It's that you maintain the records to prove you're dealing with idle potatoes. Once the applicant has shown that they meet or are willing to abide by those conditions, then the holder is obligated under Lanham Act to issue the license or whatever. Absolutely. Absolutely. Do you think there's a distinction to be made in terms of the issue before us, you know, the right to challenge the mark between a current and former licensees? No. And I think the reason why is that if you look at the history of challenges to marks, trademarks or certification marks, the challenges come from people who are former licensees who are unlawfully using the mark. So what the Second Circuit did is it encouraged and gave a reward for unlawful behavior. If you're caught cheating on the mark, as M&M was in that case, your reward is you get to challenge the mark even though you contracted not to. I think that's one of the great anomalies of the Second Circuit's decision, because it rewarded bad behavior. It rewarded unlawful behavior. The Second Circuit affirmed the district judge's issuance of an injunction against unlawful use of the mark. In fact, it wasn't even, excuse me, it wasn't affirmed. It wasn't even an issue. M&M didn't take that up. Like here, there's an injunction issued against G&T, which was using the mark after the expiration of the license. And that is an initial on appeal. So where did the Second Circuit go wrong? They went wrong by turning to Lear, which was a patent case. The facts in Lear were interesting and entirely different from what we have here. In Lear, you had an agreement between the maker of the gyroscope, the inventor, and the Lear Jet Corporation. It said that until the patent is ruled invalid, you have to pay a royalty. The Supreme Court said, no, that's inconsistent with patent law because what you're really encouraging is stretching out all the litigation over patent validity until you're in validity. And you're creating an incentive and a reward for being obstreperous and litigious. The purpose of patent law is to move ideas from the private domain to the public domain, and if they were never in the private domain, to make sure they stay in the public domain and you don't recover, as they call it, a monopoly tribute in Justice Harlan's colorful language. We don't have that kind of a situation here. The Idaho Potato Commission makes a flat fee off all of its licensees, $300 a year. It's not extracting monopoly profits. And it doesn't matter what the licensee does. They can sell as many potatoes as they want, properly licensed. So IPC is not getting rich off that. And there is no monopoly. There is no monopoly tribute here. The Second Circuit gave several reasons. They say that non-quality control provisions that benefits the mark's owner is in contravention of its obligation not to interfere with the certified product's free market. Well, what interferences are there? There are hundreds of licensees of Idaho potatoes. The record shows that. There's a constant turnover in licensees. The affidavit of Linda Douglas, who's one of the administrative officers, said, yeah, we get new licensee applications all the time. The Second Circuit said only former licensees, again quoting from Laird, have the economic incentive to challenge the mark. Well, they've got the incentive to challenge the mark when they're caught cheating, but you don't need to depend upon former licensees to challenge the mark. The briefing explained there are over 10,000 PAC, that is, Perishable Agricultural Commodity Act dealers registered with the Federal Government. Any of them could deal in potatoes if they take the proper steps to deal in potatoes. Any of them could challenge the mark. There's a huge pool of people out there. There are new licensees coming in all the time. The Second Circuit was basing its facts upon one gyroscope manufacturer and one airline purchaser of gyroscopes, and may well have been there was only one person who could challenge the mark, but we don't have that kind of a situation here, and we don't have a situation where the Lanham Act contemplates that there is a public good in moving a mark from the private domain to the public domain. In fact, it's the opposite. If there is a nuclear option in marks, it's moving it from the private domain to the public domain. Let's look at marks in general, like the Underwriters' Letter of Appointment mark. Would there be any public good in getting rid of that mark? Well, let me ask, what arguments would an applicant make or, you know, a user make to challenge the mark? The ones that the Second Circuit recited, again, don't apply. First, they say that IPC is dominated by producers. That was the allegation of MM. Well, I didn't brief this, but, of course, the Pennington-Norr doctrine says that when a government agency takes action, there are no economic consequences to that that you can overturn under the Sherman Act, and I'm assuming an analogy would be here. So that one doesn't make any sense. The second one they talked about was IPC uses its goodwill as a trademark. What they were talking about there is the Spuddy Buddy. I'm not sure if you've ever seen commercial fried potatoes, but there's a little cartoon character or a doll. Well, Section 1065 is specifically amended in the middle 90s to make it clear that use of promotional materials like that is not an improper use of the mark. The third reason the Second Circuit gave was IPC used standards unconnected to certification, and that is frankly puzzling because the standards IPC uses have to do with proper recordkeeping, which is very intimately connected with proper certification. If you don't know how many potatoes you're buying in and how many potatoes you're buying out, how can you make sure that you're properly doing it? And the fourth challenge was that IPC discriminately refuses to certify. Again, that was just a bare allegation. There was nothing that was tried below along that line in the M&M case. What we have is the Second Circuit grabbing a hold of patent law principles, which are designed to give a limited private monopoly on inventions and transforming them into the Lanham Act, not wholesale but just for one kind of mark. But the Lanham Act does not distinguish between marks with those regards. We couldn't find a case anywhere in the country where any published decision ever overturned a no-challenge provision for the Lanham Act until this one. It's off by itself. The Second Circuit is an anomaly. And the reason it's an anomaly is it took the wrong law as its standard. It took patent law as its standard. If I could just digress for a minute. We've got this rubric called intellectual property, but there are really two very distinct branches of intellectual property. There are inventions, which are things like patents and copyrights from the novel. There are conventions. That is, we put a name on something. So we have a convention of a UL and a circle, and that tells the public you can buy that appliance and take it home and you're not going to get electrocuted when you turn it on. We have all kinds of conventions then, and there is no public good in moving those conventions out so that anybody can use them. The public good is in maintaining them. And the Second Circuit treated those as something that should be freely challengeable in the same sense that patent is. Isn't it possible that a holder of a certification mark could abuse? The Second Circuit referred to it as, you know, discriminatorily retreat. It certainly could. And there are special sellers or users of the mark. There are methods to deal with that. How do you deal with circumstances where the holder might whipsaw or improperly revoke or impose standards that really aren't part of the system? You deal with that by what the Lanham Act does. First, the Federal Trade Commission can bring an action. Certainly the Patent Office has ability. And the only people that are being disqualified from bringing that are the people that have benefited from the use of the mark, the people that have freely contracted to say, I want to use your mark, and I promise not to challenge the mark. We have this tiny group out of all the people in the country who could challenge the mark, who have had the benefit of the mark, and we're saying you have to stick by your contract. If you look at the amicus, the cert petition, which I quoted at the end of my first brief, it really lays out why this case is so important. M&M was shooting at the Idaho Potato Commission, but the Second Circuit and M&M get every certification mark holder. This is what the amicus said. No challenge provisions serve important interests in avoiding litigation costs to the largely nonprofit or governmental entities that certify. The certification marks serve an essential function in contributing to informed consumer choices. All licensees benefit from the no challenge provisions because they assure the stability and predictability of the marks. M&M 3 will substantially increase licensees' costs of enforcement because every time you catch somebody cheating on the mark, they immediately retaliate the best offense, best defense is a good offense, and go against the mark. And there's no public good in withdrawing certification marks. That means you've lost. You've lost the ability to inform the public. There is a cross-appeal in this case, and I'd like to use your address. Does the record reflect the district court's reasoning for imposing the $50,000 damage award relating to the claim that G&T failed to preserve sales and purchase records in violation of the licensing agreement? The district court's reasoning was not elaborate. It did cite to the IPC rules, which are attached to our combined reply brief and appellate's response brief, that were breached. There are provisions for civil penalties in the statute and in the contract license agreement itself for violation of those rules. They did not maintain over 3,000 invoices out of a bunch of about 14,000. Well over 20% of their invoices were not maintained. So that's what the district court was talking about. Well, you're telling me what they were talking about. Did they actually talk about it? The district court did not explicitly refer to the 3,000 and 14,000. They talked about the failure to preserve records. That is in the findings. All right. So is that adequate? I believe it is adequate. If not, the solution would be to remand for more elaborate findings, not to say the district court had no authority whatsoever. With the court's permission, I'll reserve my time. Yes, that's fine. Thank you. Good morning. May it please the court, counsel. Richard Boardman on behalf of the appellee cross-appellant G&T Packaging. So why should we follow the Second Circuit's public interest rationale in voiding the no-challenge provision expressly agreed upon by your client? Isn't a contract a contract? Because it's the right reasoning, Your Honor. The Second Circuit outlined all of the policy reasons that it makes sense to not allow contract estoppel to apply, particularly in a situation like that. They outlined those reasons. They are sound reasons. Contrary to counsel's argument and the argument of the Idaho Potato Commission, it was not some type of a wholesale application of LEER. It was simply looking to the LEER principles and saying they apply in this context under the Lanham Act as well. We do not want to cut off a certification mark owner or user's rights to challenge the appropriateness and the validity of the mark. And if anything, this case is a perfect example of why that should be the case. As I listened to counsel's argument, I thought my client was somehow the wrongdoer in this case. My client, who was accused of misbranding over 2 million pounds of potatoes which started a federal lawsuit which got to trial, and those claims fell flat on their face. My client did nothing wrong. My client was licensed to use the famous Idaho, the grown-in Idaho, the Idaho potato mark that had used it for over 30 years, and then false accusations that my client was misbranding potatoes come up. You can certainly understand why my client intervened in the action in the Southern District of New York, because Idaho Potato Commission picked the fight and made what eventually turned out to be completely unfounded allegations against my client.  The perfect example of when a certification mark owner has to be reined in. And who is going to do it? But why does that give you the right to challenge the validity of the mark? Because they are abusing the mark by their overzealous enforcement, Your Honor. If they... Well, if they're wrong, they have a right to attorney's fees. And here the district court awarded you attorney's fees. But how to get there under the Lanham Act, we have to have the ability to challenge the mark. The district court did not. I'm sorry. I might have missed that. Did not award us an attorney's fee. You say that, well, we're abusing the use of the mark. We should be able to challenge it on that basis. My response is, well, you know, if they do wrongly use, if they make false allegations, as it turns out in the litigation, and you prevail, you should be able to get attorney's fees. And here, in fact, the district court awarded you attorney's fees. I agree. No, they didn't award us the district court's fees. I'm sorry. Idaho. I'm sorry. But you could, theoretically, right? Yes. But I don't think that that is the analysis. I mean, if my client then has the alternative... I was just curious about your what's the basis of, what's the nature of the challenge, as I was asking counsel. The discriminant enforcement, which is exactly what was contained in the complaint and intervention in the Southern District of New York that my client joined in. Those are the allegations. That's in the record. And it is that discriminant enforcement, as one example. I guess, though, that this other case that you're talking about that really isn't this case, are you raising that for the point that you're saying that they're really, you know, they're kind of drunk with power, as it were, and so we've got to protect against them being overzealous. But that other case where they take your client to court and the charges fell flat, that wasn't really about abuse of the mark, was it? Or was it? Yes. Were you challenging, were you making the same challenge there? Just a little history of that case. There were like four consolidated cases in the Southern District of New York. They started with the Idaho Potato Commission bringing an enforcement action against one of the other packers, M&M, as well as some other packers. So it was the identical type of, it was the identical, in essence, claims against the equivalent of my client, M&M, who, in fact, you say it was a different case. M&M packed for my client and signed an identical license agreement. So I might take a bit of an issue to say that that is somehow separate, and it is almost as close to on all fours of a case as this one is. In fact, there's been some. You're raising it more to the example of, obviously, the Attorney General basically said that, you know, hey, you're getting the benefit of the mark and there's only, you know, you use it all the time and there's only a few people that are challenging it. And you're basically saying, well, they don't exercise their authority that well, and under those circumstances people need to be able to challenge it. Yes. And under those principles that I think the Second Circuit recognized, who else is really realistically in a position to challenge it? I heard the suggestion from counsel that the Federal Trade Commission or the Trademark Office. I mean, that's not realistic. It's the people that are adversely affected by this imposition that the Idaho Potato Commission, these allegations that turn out to be false. Those are the entities that need to be tasked with bringing the necessary court action, and that is simply what the Second Circuit agreed they should have the right to do. Contract estoppel, licensee estoppel simply should not prevail or be allowed in this type of a situation to preclude a certification mark user to challenge actions such as this. The Lanham Act specifically does not authorize any challenge, does it, to a certification mark? Well, when you say this type of a challenge, not necessarily abuse, if that's what you're thinking, but certainly the Lanham Act does have provisions that allows a challenge to the validity, I think. Validity of a mark. Yes. Under 15 U.S.C. 1064 or 1054. I'm sorry, Your Honor, I should have known that, but I don't recall exactly the provision. So it does recognize, if you will, the ability for my client or other certification mark users that have been wrongly treated, as in this situation, to challenge the mark. And that's what my client, along with these other entities back in the Southern District of New York, were trying to do. But you're not really challenging the validity of the mark. Well, I think, you know, I kind of wrestled with that throughout this case. Right. I'm not challenging the validity of the mark in the sense that if there is a way to attempt to prevent the Potato Commission as the certification mark owner from its, what I call, overzealous enforcement, it is through attacking the validity of the mark. I'm not saying that there might not be other causes of action that could go along with that. But if they overzealously. But you don't contend that they didn't properly register the mark, the mark's not properly registered, that they don't issue the mark, you know, the basic things. Your contention is that they abuse their warrant to use the mark. And in the sense that they don't, what they don't have under the Lanham Act is the ability to impose any other qualifications to the use of the mark other than my client and anybody else that wants to sell genuine Idaho potatoes. They can't impose anything other than you will meet these grade standards of that particular potato. And if they go beyond that, then they are, they don't have the authority to do that as a certification mark owner under the Lanham Act. Are you going to spend a little time on your cross appeal? I would like to. Thank you, Judge. We have challenged the judgment that Judge Carter entered in our case, the several grounds that he ordered. The first one, the award for the $1, and I realize $1 certainly not very much, but it is a function of principle, and I think it sheds some light on the rest of the award. Did you challenge that in the district court, the $1? We did on our motion to alter or amend the judgment after the fact, Judge, yes. It was after the fact, so it's not in the record of the trial. No. I wouldn't say that it is, but the plaintiff, the Potato Commission, had the burden of proving its case, and the fact is that the civil penalty that the district judge awarded is a civil penalty that is permitted only under the Idaho Administrative Procedures Act by way of the statute enabling the Idaho Potato Commission, and they did not provide us with the notice and hearing that that statute, no matter how you read it, requires. Well, were they, did they present it in the trial court as a nominal damage award, or how did they present it? I don't think they even sought any specific damages for our failing to identify the variety of the potato on our packaging, which is what the $1 was awarded for. They didn't come specifically and say we need this amount of money for the failure to do that. There were some computations made about how many bags of potatoes my client had sold to his customers, but I think those were in the context of the $100,000 award for the alleged infringement. The statutory award under the landmark. Yes. What about the $50,000? Well, you know, the record-keeping award, first of all, there's a good example of what the Idaho Potato Commission did not seek. They only sought, in their proposed findings and conclusions, they only sought an adverse inference. They never sought any specific damage amount. In all due respect to Judge Carter, I don't know where this $50,000 came up from. I think he must have just kind of figured there must be some significance to $50,000, but there was absolutely no evidence put on at trial about damages that the Idaho Potato Commission had suffered by virtue of our alleged failure to keep all of the documents. Well, there is evidence, but does this need a remand for clarification? I mean, you obviously don't want it affirmed, but assuming that if the court were of the opinion to affirm it, does it need a remand for clarification? I'm not sure where a remand goes. We'd have to reopen the evidence, and I'm not sure that that is appropriate. The Potato Commission already had its opportunity to present the evidence, and I don't think opening the door again on remand for some other evidentiary hearing is appropriate. Well, just a minute. So you're implying that the present record does not contain sufficient evidence to support the $50,000 award. He's talking about thousands of, you know, thousands of failures in record-keeping. But the problem is that he never put on any evidence how that somehow affected them in their claims in this case. They tried to make a big deal out of it in the court, and we explained and put that into a little context, but they never causally related it to any damage figure, and that's where there is this gap that I simply cannot explain how the trial judge came up with this $50,000 figure. The other issue is that we honestly do believe that we complied with the requirements for maintaining the records. We turned over thousands and thousands of pages of records, not only in response to document production requests, but also in response to subpoenas in the M&M case that we were involved in. The counsel for G&T who kind of oversaw those record production efforts is here in the courtroom today, and her affidavit is in the record, and she oversaw that and stated we produced everything that we had. Yes, we stipulated that maybe not all of the documents were produced, but it wasn't any intentional effort to hide documents. I'd also like to move on to the issue. But you are required to keep records on everything, so there were some missing records. There's evidence in the trial of that. There were some invoices that are used in our kind of purchase and sale of Idaho potatoes that were missing. Yes, there were. I would note, as I think we noted in our brief in a footnote, that the accounting firm, Deloitte & Touche, was able to locate at least some of those invoices when they subpoenaed records from our customers. Moving on to the question of whether or not there was an infringement just by virtue of using the Idaho potato mark after our license expired, I mean, I can't argue that in many circumstances that would just be completely unlawful. But under the facts of this case, where my client, again, is wrongfully accused of misbranding, of false designation of origin, and that's where this seven-year battle in federal court ends up, my client's continuation of packing Idaho potatoes and identifying them as Idaho potatoes, where is the confusion to the public? Where is the confusion to the consumer? There is none. Now, the Potato Commission argues, and I'm sure we're going to hear counsel argue, that the confusion is in our ability to control our mark. Well, that is a very circuitous argument because, yes, the Idaho Potato Commission, like any other certification mark owner, has the ability to control its mark. But it is really not apposite in this case when there is no dispute that the potatoes that we were selling were Idaho potatoes. So regardless of the fact that the Idaho Potato Commission says, well, we have to have your license and we have to have your compliance with our regulations. But that's kind of like saying, well, I let my driver's license expire, but I still drive well. I mean, I didn't commit any violations. I don't think I'm going to get very far in front of a judge and say, well, I plead not guilty. But you might get farther if the expiration was due to some unlawful action by, say, the Motor Vehicle License Department. Well, if I had a constitutional right to drive, I might. But since I've heard I don't. I think my wife has one, according to her. Judge, my point is simply that the genuineness, which is really the crux of this issue, whether we can be accused under the Lanham Act of infringing on the mark, the genuineness of the product that we sold, that we had sold for 30 years. Well, that goes to the amount of damage, the argument you're making. It doesn't go to whether or not there's been a violation of the act, does it? I would agree with you. I mean, but the way that Judge Bryant, the district judge in the Southern District of New York, in the M&M case that I addressed this identical issue, said it was that he would accept that, yes, injunctive relief, which, by the way, was granted against this early on in this case, injunctive relief would be available, but monetary damages should not be available because there is no brief. Once there's a violation, isn't that a matter within the discretion of the trial court? In other words, if there's a violation, whether or not to award injunctive relief, whether or not to award statutory damages, which doesn't require proof of injury, and if they award statutory damages, how much it should be, isn't that a matter of discretion within the trial court? I think it's an error of law because you can't, the trial judge should not have gotten to that we infringed the mark by selling ungenuine goods, if you will, because we didn't. And in order for him to even reach the damages. Oh, you violated the act by using the mark without a license. Isn't that the violation? That's the alleged violation. And what I'm suggesting is you need to go a little bit beyond that when there is actually no violation because we are not selling non-genuine goods. Injunctive relief, yes, would be available. But damage relief should not be under that. Well, what about not keeping records? That's something that in order to use the mark, you're supposed to keep the, you know, that's one of the conditions that you have, right? It is. So it's a question, though, I don't, I'm going to ask an appellant, when the appellant gets back up, where they came up with $50,000. And I can't argue that the district judge could, if he had some evidentiary basis on which to award $50,000 damages, that he could do that, that he has the authority, the power to do that. But you're saying the first you ever heard $50,000 or any sort of, was when the judge said it? Yes. It wasn't like someone said, well, for every invoice we don't have, it costs us $1,000 in order to recreate that because we have to, you know, then we have to go, we have to get it from the, you know, from the person, the consumer, we have to copy it, we have to do this. And there were 50 of them that were not properly kept, therefore $50,000. Was there, I mean, was there any testimony like that that could somehow be constructed as coming up with $50,000? Nothing even vaguely close to any type of a mathematical or objective quantification, if you will, of how the alleged failure to keep these records affected them or damaged the Idaho Potato Commission. So it's sort of like just a dart board and you hit the 50. If counsel's got a better recollection of what went on in trial, but looking at all the briefs and all the proposed findings and conclusions, I could not find it. I could not find anything to justify. Thank you. Thank you for your argument. Appreciate it. Do you have some rebuttal time? Well, tell me how to look at the record and get somewhere around $50,000. The record does not give a method of calculating $50,000. The complaint, second amendment complaint, paragraph 29, alleged failure to keep records, Idaho law allows for civil penalties for failure to keep records as it does for all other violations of the act. And so in a sense we are again into statutory damages, but there is no calculation the district court made like it did with the $100,000. For the $100,000, it said there's a premium of 7.5 cents a bag. You sold 1,250,000 bags without the license. Multiply those numbers together, you get 93,750. $100,000 is a nice round number. There is no similar mental process that the district judge wrote down for the $50,000. There is ample evidence to show massive amounts of missing records. 3,048 out of 14,758. And Idaho law provides for civil penalties. So if the question is you need further explanation, remand it. But there's ample evidence in the record to show why civil penalties could be awarded for failure to keep records. But he didn't purport to award the district court, Judge Carter, didn't purport to award civil penalties. No, he didn't. That part of the decision was cryptic, I guess, for lack of a better description. Judge Carter did a very good job. Well, what about Mr. Boardman's argument that, well, with respect to that part of the award, that since the record is insufficient to support the award of $50,000, we should just simply reverse and that would be the end of it? The record is not insufficient to support an award of civil penalties. There is ample evidence of 3,000 missing invoices. And Idaho law provides for civil penalties. What is missing is the explicit rationale. Did you ask for an explicit amount? We did not ask for an explicit amount there. Did you provide the district court with a method for arriving at a damages amount? We did not. So we don't know, does Judge Callahan. He just took a dart and threw it up there. Did you ask for civil penalties for that violation? We did not in our ñ in our ñ I mean before the district court. Before the district court, we generally prayed for civil penalties for violation of Idaho law, but we didn't really distinguish between the improper labeling for which we got a dollar and things like that. We just had a general prayer for civil penalties. Was there a pretrial conference order here in this case before the case went to trial? Not that I recall with regard to this. Mr. Bortman could certainly correct me, but I don't remember one. Usually a pretrial conference order specifies what the issues are that are going to be tried at the trial. We had the ñ we had the logistical difficulty of Judge Carter being in Santa Ana and us being in Boise. And so I think a lot of things that may have been done were ñ Anything further? Just a few points. There's nothing in the record to show that the Idaho Potato Commission has been abusing its authority. It sued four people in New York, or four people were involved in New York. There's an injunction issue in M&M because they're improperly using the mark. G&T, there's been an injunction issue. Because of 3,000 missing invoices, we could not track whether G&T was actually selling or not selling Idaho potatoes. And the only way to find that out was to get into the middle of litigation. In the end, we couldn't prove it. But we had very good grounds. When you have 3,000 missing invoices, that's a lot of spuds. How could we know? How could we know if they all came from Idaho? And the answer is, when we filed suit, we couldn't know. In fact, it looked very suspicious to us. As far as HAPCO, that was settled. And the fourth one, Majestic, went into bankruptcy, and nothing was ever pursued after the bankruptcy. So four instances, no abuse of power, no attempt to just willy-nilly throw our weight around. A tiny agency with 16 or 17 people, I'm not sure how much weight we'd have to throw around. And just one final point. There was a suggestion that there was some unlawful action by IPC associated with expiration of the license. I don't know what that is. There's nothing in the record regarding that. The license expired when it was not renewed. These are on one-year renewals. There was no application to renew when the license expired. With that, I'll ask if the Court has further questions. Yes. What about the argument that although the license had expired, these goods were still genuine goods? Oh, I'm glad you brought that up. If you look at McCarthy, they say that the use of the license by a former licensee is in itself fraudulent. And let's take the analogy of Underwriters Laboratory. Let's say that your UL license expired and UL came after you a few years later and you said, oh, well, I could have proven I met your safety standards. That's not good enough. When you see the UL on there, that means UL is actually doing the inspections and not you could prove a couple years after the fact you would have met UL safety standards. Because if you open it up on this one, you're opening it up for every certification mark in the country. Okay. Thank you very much. We appreciate your argument, Counsel. The matter will be submitted. We'll take a ten-minute recess.
judges: Tashima, Paez, Callahan